[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12048

_____

D.C. Docket No. 1:17-cv-00089-JRH-BKE

CHRISTOPHER VARNER,

Plaintiff–Appellant,

versus

STAN SHEPARD
JERRY BEARD
ANTONIO BINNS
JUSTIN WASHINGTON
LENON BUTLER
RODGERICK NABORS
JULIAN GREENAWAY,

Defendants–Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(August 31, 2021)

Before WILSON, JILL PRYOR, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Christopher Varner appeals the district court's order dismissing with prejudice his 42 U.S.C. § 1983 claims against the Georgia Department of Corrections ("GDC") and Augusta State Medical Prison ("ASMP") officials (collectively, "Defendants"). The district court found that Varner did not properly exhaust the available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. On appeal, Varner argues that there were no available administrative remedies, or, alternatively, that the remedies were exhausted. For the reasons set forth below, we affirm.[1]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    GDC Grievance Procedure

Relevant here is GDC's 2012 grievance policy. Upon entering GDC, inmates receive a copy of this policy in their Orientation Handbook and an oral explanation of the policy. The policy allows inmates to assist each other in filling out grievances, and notes that "[i]nstitutional staff will assist offenders who need special help filling out the grievance forms (i.e., due to language barriers, illiteracy, or physical or mental disability) upon request." GDC "encourages," but does not require,

---

[1] Varner also requested that if this Court did not reverse, his case be remanded for further discovery. Because additional discovery would not relate to facts relevant to our decision, we deny that request.

2

"offenders to try to resolve complaints on an informal basis before filing a grievance."  It is clear from the Handbook, however, that a formal grievance must be filed in order to initiate GDC's administrative process.

The GDC policy generally consists of a two-step procedure for submitting a grievance.  For the first step, the inmate must file a grievance form within ten days of when he knew or should have known of the incident.[2]  A grievance coordinator screens the form for procedural compliance, including timeliness.  If the grievance coordinator finds that the grievance is procedurally flawed, and the warden agrees, the grievance is rejected.  If the grievance coordinator finds that the grievance is procedurally compliant (or if the warden disagrees with the grievance coordinator's recommendation to reject the grievance for procedural flaws), then the grievance is processed, investigated, and decided on the merits.  For the second step, the inmate can file a central office appeal after receiving a response to his grievance (either a procedural rejection or a decision on the merits).

Grievances reporting physical force that does not comply with GDC's use-of-force procedures—like all grievances—are subject to the ten-day filing deadline, as well as the good cause exception.  These types of grievances, however, are not

---

[2] This deadline may be waived by GDC for "good cause."  Good cause is defined as "[a] legitimate reason involving circumstances that prevented the offender from timely filing a grievance or an appeal.  Examples include:  serious illness, being housed away from a facility covered by this procedure (such as being out on a court production order or for medical treatment)."

3

subject to the remainder of the two-step procedure. Instead, such grievances are "automatically forwarded" to the Internal Investigations Unit ("IIU"), and "such actions automatically end the grievance process." "Once a grievance is referred to the Internal Investigations Unit . . . then this is the final action that will be taken on the grievance and terminates the grievance procedure." The inmate receives notice that his grievance was forwarded to the IIU and terminated, although Varner alleges that inmates did not receive notice of the outcome of the IIU investigation. Inmates may not appeal the decision to refer a grievance to the IIU. Notably, any subsequent investigation or action taken by the IIU is not part of the grievance procedure.

B.    Varner's Claims[3]

In his amended complaint, Varner alleges that he was housed at ASMP between 2012 and February 2014 due to his schizophrenia, organic brain damage, severe diabetes, and bipolar disorder. On February 13, 2014, while Varner was standing in the medication line in a hallway, several officers entered the hallway and shouted epithets at the inmates. When Varner verbally responded to the officers, Sergeant John Williams[4] grabbed Varner and attempted to handcuff him. Varner struck Sergeant Williams in the head, and the officers responded by bringing Varner

---

[3] Our description of the incident comes from the allegations in Varner's amended complaint. Our description of the post-incident events comes from the Defendants' motion to dismiss and the documents filed by the parties relating to the Defendants' failure to exhaust administrative remedies defense.

[4] Sergeant Williams is not a defendant in this case.

into a small vestibule and placing him in a chokehold until he lost consciousness. When Varner regained consciousness, he was handcuffed and bleeding in the vestibule while the officers stood around him. Officers punched, kicked, and stomped on Varner while he was handcuffed and lying on the floor. The officers next brought Varner to the medical unit building and entered an elevator. They rode up and down the elevator four times, with the officers continuing to use force against Varner, including the use of pepper spray and a metal baton, despite Varner being handcuffed and compliant. Finally, the officers took Varner to ASMP's medical unit, where they continued their attacks, even though a nurse pleaded with them to stop. Varner was transferred to a civilian hospital for treatment of a broken eye socket, jaw, and nose, and extensive bruising on his face and torso. Varner continues to suffer from pain in his jaw and feet, frequent headaches, and exacerbation of his preexisting mental illnesses.

On the same day of the incident, the warden referred it to the IIU. Also on the same day as the incident, Varner's father lodged a complaint with ASMP, and Varner's mother did the same shortly thereafter. After reviewing a partial video recording of the incident and interviewing the three officers, the IIU determined that the officers had used excessive force. As a result of the IIU investigation, two of the Defendants in this case, Officer Antonio Binns and Officer Justin Washington, as well as Sergeant Williams, resigned in lieu of termination. Several years later, all

5

three officers pleaded guilty to federal criminal charges related to the assault and were sentenced to five years' probation, a $2000 fine, and a $100 special assessment. *United States v. Williams*, No. 1:16-CR-00024 (S.D. Ga. Apr. 12, 2017).

About one month after the incident, on March 12, 2014, Varner filed two grievances. Both of these grievances were related to Varner's diabetes and not the excessive force incident, and both were rejected on procedural grounds.

Varner later filed three grievances related to the excessive force incident—on July 24, 2015, June 24, 2016, and June 21, 2017. These grievances were all rejected as untimely. Varner appealed the rejection of his 2016 grievance, but the appeals investigator rejected the grievance as untimely. Varner did not appeal the rejection of the other two grievances. None of these grievances were categorized as reporting excessive use of force, the type of grievance that would be automatically forwarded to the IIU. In support of their motion to dismiss for failure to exhaust, however, Defendants submitted an affidavit from a prison official, who explains that all grievances, regardless of their categorization, are screened for procedural compliance. Additionally, the same filing deadline under the GDC policy applies to grievances asserting a compliant use of force and grievances asserting an excessive use of force.

On August 30, 2017, Varner and two other ASMP inmates filed an amended complaint in federal district court. The Defendants moved to dismiss. Relevant

6

here, the defendants argued that Varner's claims were barred by the PLRA because he did not exhaust his administrative remedies. In connection with this exhaustion argument, the Defendants and Varner submitted documents, including affidavits, relating to the incident and Varner's grievances.

The district court granted the motion to dismiss as to Varner. Applying this Court's two-step procedure for analyzing exhaustion, *see Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008), the district court first considered whether, taking Varner's allegations as true, Varner's claims should be dismissed. Because Varner alleged that administrative remedies were not available, and thus the exhaustion requirement would not apply, the district court did not dismiss at the first step of its analysis. At the second step, the district court made factual findings in order to resolve the parties' factual disputes regarding exhaustion of administrative remedies. The court determined that: (1) administrative remedies were available to Varner; (2) the IIU investigation did not excuse Varner's exhaustion obligation; and (3) Varner's untimely grievances did not satisfy the exhaustion requirement. The district court therefore dismissed Varner's claims with prejudice. Because Varner's co-plaintiffs' claims were not affected by the dismissal of Varner's claims, the district court certified a final judgment against Varner pursuant to Federal Rule of Civil Procedure 54(b). This appeal ensued.

7

## II.    STANDARD OF REVIEW

"We review *de novo* the interpretation and application of 42 U.S.C. § 1997e(a)'s exhaustion requirement." *Whatley v. Warden ("Whatley I")*, 802 F.3d 1205, 1209 (11th Cir. 2015) (quoting *Johnson v. Meadows*, 418 F.3d 1152, 1155 (11th Cir. 2005)).  The district court's factual findings relating to the exhaustion requirement are reviewed for clear error.  *Id.*  Otherwise, "we accept as true the facts as set forth in the complaint and draw all reasonable inferences in [the plaintiff's] favor."  *Id.* (quoting *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010)).

## III.    ANALYSIS

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  Thus, "when a state provides a grievance procedure for its prisoners, as Georgia does here, an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit." *Johnson*, 418 F.3d at 1156 (quoting *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir. 2007)).

"[F]ailure to exhaust is an affirmative defense under the PLRA." *Jones v. Bock*, 549 U.S. 199, 216 (2007).  There is a "two-step process" for analyzing

exhaustion at the motion to dismiss stage. *Turner*, 541 F.3d at 1082. A district court must first determine whether the complaint should be dismissed for lack of exhaustion "tak[ing] the plaintiff's version of the facts as true." *Id.* Second, if the complaint is not dismissed at the first step, the district court must "make specific findings in order to resolve the disputed factual issues related to exhaustion," bearing in mind that defendants have the burden of proof, and "decide[] whether under those findings the prisoner has exhausted his available administrative remedies." *Id.* at 1082–83. Varner's claims were dismissed at the second step.

Although Varner did not submit a timely grievance in accordance with GDC policy, he makes two arguments as to why his claims should not have been dismissed. First, he argues that there were no available administrative remedies under the GDC policy. In the alternative, he argues that in fact the remedies were exhausted. We address these arguments in turn.

### A.    Availability

In *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016), the Supreme Court held that § 1997e(a)'s exhaustion requirement is "mandatory" and that courts therefore "may not excuse a failure to exhaust" due to "special circumstances." There is an exception to the exhaustion requirement, however, that is "baked into" § 1997e(a)'s text: "[a]n inmate need exhaust only such administrative remedies as are 'available.'" *Id.* at 1862. "Accordingly, an inmate is required to exhaust those, but

9

only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The Court "note[d] as relevant here three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief": (1) when the procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process though machination, misrepresentation, or intimidation." *Id.* at 1859–60.

Varner argues that an administrative remedy was not available for three reasons: (1) the GDC's grievance procedure for excessive force complaints operates as a "dead end"; (2) the IIU process is not capable of being exhausted; and (3) Varner's mental illness rendered the grievance procedure unavailable to him. We address each argument in turn.

Varner first argues that the GDC grievance procedure for excessive force complaints operates as a dead end because the complaints are automatically terminated and forwarded to the IIU. In order to be "available," an administrative procedure must offer "the possibility of some relief for the action complained of." *Booth*, 532 U.S. at 738. "Without the possibility of some relief, the administrative

10

officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust." *Id.* at 736 n.4. Where there is the possibility of some relief, however, a prisoner must "exhaust the grievance procedures offered, whether or not the possible responses cover the specific relief the prisoner demands." *Id.* at 738. The PLRA "mandates strict exhaustion, 'irrespective of the forms of relief sought and offered through administrative avenues.'" *Johnson*, 418 F.3d at 1155 (quoting *Booth*, 532 U.S. at 741 n.6). In short, "inmates must exhaust administrative remedies so long as there is the possibility of at least some kind of relief." *Id.* at 1156 (quoting *Ross v. County of Bernalillo*, 365 F.3d 1181, 1187 (10th Cir. 2004)).

Here, the GDC policy does offer "the possibility of some relief" in the form of forwarding the excessive force complaint to the IIU. *See Booth*, 532 U.S. at 736 n.4. Although this relief is limited, investigation of the complaint by the IIU may result in further relief. Here, for example, the IIU investigation led to the resignations and criminal convictions of several officers. Furthermore, once a grievance alleging excessive force is referred to the IIU, the grievance process automatically terminates, fulfilling the inmate's exhaustion requirement for purposes of the PLRA.

Moreover, the automatic nature of the procedure does not render it a dead end. Although prison officials have no discretion in dealing with procedurally compliant

11

grievances regarding excessive force—they must forward the complaint to the IIU and terminate the grievance—they do not "lack[] authority to provide any relief or to take any action whatsoever in response to a complaint." *See id.* at 736. Rather, GDC officials *must* take action on every such excessive force grievance by forwarding it to the IIU. Therefore, when properly submitted and handled in accordance with GDC policy, all excessive force grievances result in some relief, even if not the relief requested by the inmate.

Although the GDC procedure bears some similarities to a Maryland procedure that troubled the Supreme Court in *Ross*, we note two key distinctions. In *Ross*, the plaintiff failed to use Maryland's standard grievance process to make an excessive force claim, but did report the assault to a senior corrections officer, who referred the incident to the state's IIU. 136 S. Ct. at 1855. The plaintiff argued that his failure to exhaust the standard grievance procedure should have been excused because "wardens routinely dismiss [standard] grievances as procedurally improper when parallel IIU investigations are pending." *Id.* at 1860–61. Evidence "suggest[ed] that some wardens use a rubber stamp specifically devised" to dismiss complaints when an IIU investigation was already in progress. *Id.* at 1861. The Supreme Court remanded the case, asking, among other questions, whether "Maryland's standard grievance procedures potentially offer[ed] relief to [the plaintiff] or, alternatively, did the IIU investigation into his assault foreclose that possibility?" *Id.* at 1862.

12

We first note that in *Ross*, evidence suggested a grievance would be dismissed routinely where an IIU investigation was already in progress. If there were no such IIU investigation, the same grievance could proceed. Thus, the Supreme Court remanded to determine whether the existence of an IIU investigation "foreclose[d]" the possibility of otherwise available relief. *Id.* Here, every procedurally compliant excessive force grievance is referred to the IIU before being terminated, regardless of whether an IIU investigation is already pending. Thus, unlike *Ross*, GDC grievances are not dismissed for the sole reason that a separate IIU investigation is already in progress. Second, in *Ross*, grievances were "[d]ismissed for procedural reasons" when an IIU investigation was pending. *Id.* at 1861. This could bar the inmate from bringing a civil suit because "the PLRA's exhaustion requirement . . . contain[s] a procedural default component." *Johnson*, 418 F.3d at 1159. In contrast, the submission, referral, and automatic termination of a procedurally compliant excessive force grievance under the GDC procedure fully satisfies the PLRA's exhaustion requirement. We therefore conclude that GDC's grievance policy is distinct from the policy at issue in *Ross* and is not a "dead end."

Varner's second argument fails for similar reasons. Varner argues that it was not possible to exhaust GDC's grievance procedures because inmates were not notified of the results of IIU investigations. But as explained above, inmates need not wait for the IIU investigation to conclude before filing a civil suit. Rather, under

13

the GDC procedure, an inmate exhausts his administrative remedies once he properly submits a grievance alleging excessive force because that act automatically ends the grievance process. Referral to the IIU is itself the relief offered by GDC policy and terminates the grievance process. An inmate therefore has exhausted his administrative remedies as soon as his claim is referred to the IIU, regardless of the outcome of that referral.

Finally, Varner argues that the grievance process was unavailable to him because of his mental illness. This Court has not previously addressed the question of whether mental illness may render administrative remedies unavailable and thus excuse § 1997e(a)'s exhaustion requirement. We need not reach that issue here, because the district court made a factual finding that Varner's mental illness did not prevent him from accessing the grievance process. We review the district court's factual findings for clear error. *Whatley I*, 802 F.3d at 1209. "Under clear error review, we will reverse only if after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." *Silva v. Pro Transp., Inc.*, 898 F.3d 1335, 1339 (11th Cir. 2018) (quoting *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1213 (11th Cir. 2015)).

Here, the district court found that the two diabetes-related grievances Varner filed on March 12, 2014, were "close enough in proximity" to the February 13, 2014, incident "to show Varner understood how to utilize the grievance procedure" within

14

the ten-day window. The district court's finding that Varner's close-in-time grievances demonstrate that he was aware of the grievance process and capable of submitting a completed grievance is not clearly erroneous. Therefore, regardless of whether an inmate's mental illness may render an administrative remedy unavailable in some other case, it did not do so here.

B.    Exhaustion

Varner argues in the alternative that his administrative remedies were, in fact, exhausted because a referral to the IIU actually occurred, which would have been his only relief under GDC's grievance procedures for an excessive use-of-force claim. "The plain language of the [PLRA] makes exhaustion a precondition to filing an action in federal court." *Higginbottom v. Carter*, 223 F.3d 1259, 1260 (11th Cir. 2000) (quoting *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999)) (rejecting exception to exhaustion requirement for excessive use-of-force claims). In *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), the Supreme Court held that "the PLRA exhaustion requirement requires proper exhaustion." Proper exhaustion "means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.)" *Id.* at 90 (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Therefore, "[t]o exhaust administrative remedies in accordance with the PLRA, prisoners 'must properly take

15

each step within the administrative process.'" *Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008) (quoting *Johnson*, 418 F.3d at 1158).

In support of his exhaustion argument, Varner advances two points. First, he argues that his family's informal complaints to ASMP and his own untimely grievances, either of which may have been the instigators of the referral to the IIU, satisfied the exhaustion requirement. Second, Varner argues that the fact that a referral occurred in and of itself satisfies the PLRA's exhaustion requirement, regardless of whether it was the result of the GDC's administrative process,.

We turn first to Varner's family's informal complaints and his own untimely grievances. As noted earlier, Varner's parents each complained to ASMP almost immediately after Varner was beaten. While the GDC encourages the use of informal complaints like those lodged by Varner's parents, a formal grievance must be submitted to initiate the administrative process. These informal complaints therefore do not satisfy the "proper exhaustion" requirement established by *Woodford* and *Bryant*.

Regarding Varner's three grievances relating to the incident, there is no dispute that they were untimely; Varner filed the first grievance almost a year and a half after he was beaten. Varner argues, however, that his grievances may have been automatically forwarded to the IIU despite his procedural errors and that we should consider them as having satisfied the PLRA's exhaustion requirement. Our Court

16

recognizes that a prison's waiver of a procedural defect in the grievance process can result in a waiver of its exhaustion defense. *See, e.g., Whatley v. Warden ("Whatley II")*, 898 F.3d 1072, 1084 (11th Cir. 2018) (holding that "a prison waives its procedural objections to considering the merits of a grievance, and therefore waives its exhaustion defense, if it does not *explicitly* rely on the grievance's procedural shortcomings as an adequate and independent ground for denying the grievance at the administrative level" (emphasis in original)).  Here, however, there was no waiver.  Specifically, Varner's first and third untimely grievances were not exhausted because Varner did not appeal their dismissal. *See Bryant*, 530 F.3d at 1378 ("If their initial grievance is denied, prisoners must then file a timely appeal."). And although Varner did appeal the dismissal of his second untimely grievance,  the appeals investigator rejected the grievance as "out-of-time," i.e., the investigator explicitly relied on the grievance's procedural defect as a basis for denying Varner's grievance. *See Whatley II*, 898 F.3d at 1084.  Thus, Varner's claim in his grievances is procedurally defaulted, not exhausted. *See Johnson*, 418 F.3d at 1159 ("[T]he PLRA's exhaustion requirements . . . contain[s] a procedural default component.").

We now turn to Varner's argument that his administrative remedies were exhausted because a referral to the IIU occurred—the only relief that Varner could have received had he properly followed the GDC's administrative process, even though the referral resulted from something other than a properly submitted

17

grievance (e.g., referral by the warden, Varner's parents' informal complaint, or Varner's own untimely grievances). At first blush, this seems like an attractive argument, particularly in light of the facts of this case where the referral to the IIU resulted in the resignation and ultimately the criminal conviction of several officers. Moreover, Varner's argument seems consistent with the policy reasons we have identified previously as underlying exhaustion requirements. *See, e.g.*, *Alexander v. Hawk*, 159 F.3d 1321, 1327 (11th Cir. 1998). But the equities of Varner's argument are not supported by either the statutory text or controlling precedent. And while, if we were writing the PLRA, we might craft a narrow exception to the exhaustion requirement to take into account the particular circumstances faced here, that is Congress's role and requires legislative, not judicial, action.

We turn first to the text of the statute. Title 42 U.S.C. § 1997e, "Suits by prisoners," provides in relevant part:

> **(a) Applicability of administrative remedies.** No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Explicit in this statutory exhaustion requirement is Congress's mandate that an inmate exhaust his "administrative remedies." The use of the modifier "administrative" indicates, on its face, that exhaustion must be accomplished

18

through an administrative process and not, as Varner proposes, via separate nonadministrative means.

Moreover, Varner's argument depends upon reading "remedies" to mean types of relief, as opposed to processes for obtaining such relief. That is, because the only relief that could be obtained via the administrative process has occurred, Varner's available administrative remedies have been exhausted. That reading of the statutory text, however, is foreclosed by the Supreme Court's decision in *Booth v. Churner*. In *Booth*, the Supreme Court noted that the word "remedy" can mean either "specific relief obtainable at the end of a process of seeking redress, or the process itself, the procedural avenue leading to some relief," and then concluded, based on the context in which the words appear, that "remedies" as used in § 1997e(a) refers to the administrative process, not the particular forms of relief occurring at the end of that process. 532 U.S. at 738–39. As the Court explained:

> The entire modifying clause in which the words occur is this: "until such administrative remedies as are available are exhausted." The "available" "remed[y]" must be "exhausted" before a complaint under § 1983 may be entertained. While the modifier "available" requires the possibility of some relief for the action complained of . . . , the word "exhausted" has a decidedly procedural emphasis. It makes sense only in referring to the procedural means, not the particular relief ordered. . . . It makes no sense to demand that someone exhaust "such administrative [redress]" as is available; one "exhausts" processes, not forms of relief, and the statute provides that one must.

*Id.* (alterations in original) (quoting § 1997e(a)). Thus, "Congress meant to require *procedural* exhaustion regardless of the fit between a prisoner's prayer for relief and

19

the administrative remedies possible." *Id.* at 739 (emphasis added). And, as the Supreme Court stated subsequently in *Ross*, "all inmates must now exhaust all available remedies." 136 S. Ct. at 1858.

As is its prerogative, Congress established a bright line prerequisite for a suit by an inmate—in this case, the filing of a grievance pursuant to and in compliance with the process set forth in GDC's Handbook. Varner did not file a timely grievance, and referral to the IIU by the warden cannot satisfy Varner's obligation to properly initiate and complete the administrative process, as the warden's actions are outside the GDC's administrative process. Thus, based on the text of the PLRA, Varner's argument that the PLRA's exhaustion requirement was met without proper initiation and completion of GDC's administrative process must fail.

To the extent that Varner argues for an exception to the exhaustion requirement based on the particular facts here, that avenue is also foreclosed by the decisions of both the Supreme Court and this Court. As noted earlier, in *Ross*, the Supreme Court held that § 1997e(a)'s exhaustion requirement is "mandatory," and "the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.'" 136 S. Ct. at 1856. The only exception, which comes from the statutory text itself, is that an inmate need only exhaust those grievance procedures that are "available." *Id.* at 1858. As discussed above, none of the circumstances identified in *Ross* that would render an administrative remedy

20

unavailable exist here—the relief for an excessive use-of-force claim was referral to the IIU, and that relief was available to Varner had he filed a timely grievance, regardless of whether a referral to the IIU of the incident separately occurred outside of the administrative process.

We further note that in *Ross*, the Supreme Court explained that the basis for rejecting requests to create exceptions to the PLRA's "uncompromising statutory text," *id.* at 1857, even when the special circumstances of a particular case might seem to call for one,[5] was the structural separation of powers between the legislative and judicial branches:

> And [the exhaustion requirement's] mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion

---

[5] The facts of *Ross* are similar to those here. In *Ross*, an inmate informally reported an assault to a senior corrections officer, who then referred the incident to the Maryland prison system's IIU. 136 S. Ct. at 1855. The IIU's final report resulted in the resignation (in lieu of termination) of one of the officers involved in the incident. *Id.* Significantly, despite his informal complaint, the inmate never filed a formal grievance under Maryland's administrative process because he thought "the IIU investigation seved as a substitute for that otherwise standard process." *Id.* The Fourth Circuit concluded that certain "special circumstances" created an exception to the PLRA's exhaustion requirement, in particular where an inmate reasonably, although mistakenly, thought that he had exhausted his remedies. *Id.* at 1856. The Supreme Court rejected this "special circumstances" exception based on the statutory language and history of the PLRA. *See id.* at 1856–58. The Court, however, remanded the matter for further consideration in light of evidence that Maryland prison officials routinely dismissed, as procedurally improper, administrative grievances when there was a pending parallel IIU investigation, which, if true, raised the possibility that the administrative remedies the inmate failed to exhaust in *Ross* were not "available" and therefore not subject to the statutory exhaustion requirement. *See id.* at 1858–62.

statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.

*Id.* at 1856–57 (citations omitted).  Indeed, the Court in *Ross* noted that it has "taken just that approach in construing the PLRA's exhaustion provision—rejecting every attempt to deviate . . . from its textual mandate."  *Id.* at 1857; *see also*, *Booth*, 532 U.S. 731 (rejecting exception to the PLRA exhaustion requirement where specific relief was not provided by administrative process); *Porter v. Nussle*, 534 U.S. 516 (2002) (rejecting exception to the PLRA exhaustion requirement for excessive force claims); *Woodford*, 548 U.S. 81 (rejecting exception to the PLRA exhaustion requirement for constitutional claims).

At its core, Varner's request is akin to a futility argument, i.e., because the only relief Varner could obtain from a timely grievance has occurred, it would serve no purpose to enforce the PLRA's exhaustion requirement here.  In *Alexander v. Hawk*, 159 F.3d 1321 (11th Cir. 1998), however, this Court rejected creating a futility exception to the PLRA.  In *Alexander*, an inmate argued that the PLRA's exhaustion requirement did not apply because the federal Bureau of Prison's administrative remedies did not allow the agency to award him either monetary damages or his requested injunctive relieve, thereby rendering the administrative remedies futile and inadequate. *See id.* at 1325.  In rejecting this argument, we stated that "the judicially recognized futility and inadequacy exceptions do not survive the new mandatory exhaustion requirement of the PLRA" and that, "[s]ince exhaustion

22

is now a pre-condition to suit, the courts cannot simply waive those requirements where they determine they are futile or inadequate." *Id.* at 1325–26; *see also Higginbottom*, 223 F.3d at 1261 ("[T]he exhaustion requirement cannot be waived based upon the prisoner's belief that pursuing administrative procedures would be futile." (citing *Alexander*, 159 F.3d at 1323)).  Thus, even absent *Ross* and the Supreme Court's other PLRA cases discussed therein, we are bound by our own precedent and must reject Varner's argument here.  *See United States v. Vega-Castillo*, 540 F.3d 1235, 1237 (11th Cir. 2008); *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998) ("We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision.").

## IV.    CONCLUSION

In the PRLA, Congress established a mandatory exhaustion requirement.  As set forth in *Ross*, the only exception, which is established by the statutory text itself, is that administrative remedies must be available.  Other than this single congressionally-created exception, the statutory language and relevant case law make it clear that courts are not free to fashion exceptions to the exhaustion requirement, even when the circumstances of a particular case may seem to merit one.  Here, GDC's grievance procedure was available to Varner.  Because Varner did not file a timely grievance and because GDC did not waive the procedural defects

23

in the untimely grievances that Varner did file, Varner failed to satisfy the PLRA's exhaustion requirement.  The distict court therefore properly dismissed Varner's suit with prejudice, and we affirm.

**AFFIRMED.**

JILL PRYOR, Circuit Judge, concurring in part and dissenting in part:

Christopher Varner suffered a horrific attack, resulting in serious injuries, at the hands of people entrusted to ensure his safety—guards at the prison where he was incarcerated. Because he was incarcerated, Mr. Varner was required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, to exhaust available administrative remedies before filing this lawsuit against several of his attackers and prison officials. The majority explains, and I agree, that Mr. Varner failed to timely pursue the administrative procedures set forth in the Georgia Department of Corrections' ("GDC") grievance policy. I depart from the majority opinion, however, in that I would allow Mr. Varner to pursue this lawsuit because, in my view, there were no administrative remedies available to him. Respectfully, I dissent from the majority's conclusion to the contrary.

My disagreement with the majority opinion is quite limited in scope, if not in impact.[1] I agree with the majority's description of GDC's grievance policies. Under those policies, grievances reporting the use of excessive force by prison personnel were "automatically forwarded" to GDC's Internal Investigations Unit ("IIU"), an action that "automatically end[ed] the grievance process," Doc. 29-2 at 17,[2] and "any subsequent investigation or action taken by the IIU [was] not part of

---

[1] I concur in the majority opinion in all respects other than the one I discuss here.

[2] "Doc." numbers refer to the district court's docket entries.

the grievance procedure." Maj. Op. at 4.[3] I agree that Mr. Varner did not timely file an excessive force grievance about his attack. The majority opinion accurately lays out the basic PLRA exhaustion framework, including that an incarcerated person cannot file a federal lawsuit "until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a), and that a procedure that "operates as a simple dead end" is not "available" within the meaning of the PLRA, *Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016). A procedure is a dead end when it does not offer "the possibility of some relief for the action complained of." *Booth v. Churner*, 532 U.S. 731, 738 (2001).

Where we disagree is the majority opinion's conclusion that the GDC policy offered the possibility of some relief for the action complained of—and thus was not a dead end, was "available," and was required to be exhausted—"in the form of forwarding the excessive force complaint to the IIU." Maj. Op. at 12. Although I think the question is a close one, for reasons I will explain, I disagree that the automatic forwarding of an excessive force complaint qualifies as "relief." That is because further *process*—forwarding the complaint to the IIU, for whatever investigation that body undertakes—does not *substantively* address the underlying allegations, as the Supreme Court's *Booth* decision appears to require.

---

[3] I use past tense here because GDC's policies have since been amended.

At issue in *Booth* was whether an incarcerated person "seeking only money damages" had to file a grievance complaining of prison personnel's use of excessive force when the "prison administrative process . . . could provide some sort of relief on the complaint stated, but no money." *Booth*, 532 U.S. at 734. The Supreme Court held that he must. *Id.* There, as here, "the crux of the case" was "[t]he meaning of the phrase 'administrative remedies . . . available'" under the PLRA. *Id.* at 736 (quoting 42 U.S.C. § 1997e(a)).[4] In parsing the meaning of these words, the Court differentiated "remedies" from "relief." "Remedies," the Court explained, are "the procedural means, not the particular relief ordered." *Id.* at 738–39. The procedural means are "available" for exhaustion purposes when they offer "the possibility of some *relief* for the action complained of." *Id.* (emphasis added).

Now, the more critical question: What is relief? The *Booth* Court explained that it is "some responsive action with respect to the type of allegations [the complainant] raises." *Id.* at 736 n.4. In other words, it is an "act on the subject of the complaint." *Id.* In *Booth*, this meant that the "grievance system addressed

_____

[4] In *Booth* the parties disputed "whether or not a remedial scheme is 'available' where . . . the administrative process has authority to take some action in response to a complaint, but not the remedial action an inmate demands." 532 U.S. at 736. Here my disagreement with the majority opinion is more preliminary: What does it mean for there to be "some action in response to a complaint," that is, some form of relief available? To put it differently, if automatic referral of the complaint to the IIU is relief, then I would agree that under *Booth* Mr. Varner would be required to exhaust his remedies even though that relief did not resemble the relief he requested. The trouble is that I do not think referral to the IIU is relief under *Booth*.

complaints of the abuse and excessive force Booth alleged," including through injunctive relief or a prison transfer, even though it lacked a provision for recovery of money damages. *Id.* at 734. I read all these ways the Court described relief, both affirmatively and *in opposition to remedy*, to say that relief is substantive.

Without a doubt, the policy of automatically forwarding an excessive force complaint to the IIU achieves something—it provides the complainant further *process*. But it fundamentally does not provide any *substantive relief* on the allegations in the complaint. And for an administrative procedure to be "available," it must provide "the administrative officers" addressing the complaint "authority" to effect substantive relief. *Id.* at 736 n.4. An administrative officer who automatically forwards the complaint to the IIU lacks any authority to affect any substantive relief whatsoever. Thus, under *Booth* I cannot see how the automatic forwarding of a complaint to Georgia's IIU is an available administrative remedy. Instead, it is a mere dead end.

I am not persuaded by the majority opinion's explanation why forwarding the complaint to the IIU is relief. The opinion explains that even though referral to the IIU is "limited" relief, it "may result in further relief," such as (and this happened here) removal of the officers. Maj. Op. at 12. Setting aside my disagreement with the premise that this is relief at all, the problem with leaning on this logic is that any "further relief," *id.*, is outside the control of "the

28

administrative officers," *Booth*, 532 U.S. at 736 n.4, and so it is irrelevant for our exhaustion inquiry. *See also* Maj. Op. at 4 (acknowledging that the IIU process is entirely separate from the grievance procedure).

This case is tough. I simply see the case slightly differently from the majority, and that slight difference has a significant impact for Mr. Varner and for PLRA litigation in Georgia. Under the majority's reasoning, an incarcerated person seeking to exhaust an excessive force claim in the state must only timely file a compliant grievance; this simple act "fulfill[s] [his] exhaustion requirement for purposes of the PLRA." *Id.* at 12. This is not a heavy burden, but I would conclude that the PLRA requires even less. Since GDC's grievance procedure for excessive force claims is a dead end, I would not require Mr. Varner or anyone in his shoes to file a grievance at all.