[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13621

Non-Argument Calendar

_____

ROBERT RALPH DIPIETRO,

Plaintiff-Appellant,

*versus*

JAMES F. BARRON,
Dentist,
DR. SILVER,
Psychiatrist,
DR. THOMPSON,
Psychologist,
WARDEN,
DEPUTY WARDEN SHELTON, et al.,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 4:18-cv-00179-CDL-MSH

———————————

Before WILSON, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Robert DiPietro appeals the district court's entry of summary judgment in favor of the defendants in his lawsuit alleging that healthcare providers at two Georgia prisons were deliberately indifferent to his serious medical needs. After careful consideration, we affirm.

## I.

DiPietro was convicted of child molestation in March 2016 and sentenced to seven years in state prison. After two months in the county jail, DiPietro was transferred to Georgia Diagnostic and Classification Prison (GDCP) on May 5, 2016, and then to Augusta State Medical Prison on July 12, 2016. On August 16, 2016, DiPietro was transferred to Rutledge State Prison, where he remains.

21-13621　　　　　　　Opinion of the Court　　　　　　　3

On August 19, 2018,[1] DiPietro filed a lawsuit against several prison officials and healthcare providers at GDCP and Rutledge, pursuant to 28 U.S.C. § 1983. As relevant to this appeal, DiPietro alleged that an advanced practice psychiatric nurse at GDCP (Jerrye Foreman) and two mental health providers at Rutledge (psychologist John Thompson and psychiatrist Donna Silver) deliberately ignored his need for psychiatric medications and counseling, leading to his attempted suicide. He also alleged that a dentist at GDCP (James Barron) deliberately failed to provide treatment for an infected tooth, resulting in months of pain and suffering and the loss of the tooth.

The district court entered summary judgment in favor of the defendants. It concluded that DiPietro had failed to exhaust his prison administrative remedies for his claims against Foreman and Barron, as required by the Prison Litigation Reform Act (PLRA); that the statute of limitations barred his claim against Barron; and that DiPietro failed to show that any of the four healthcare providers were deliberately indifferent to a serious medical need. DiPietro now appeals, challenging the district court's rulings in favor of the four healthcare providers.

---

[1] Under the prison mailbox rule, a pro se prisoner's court filing is deemed filed on the date that he delivered it to prison authorities for mailing, which we ordinarily presume to be the same day that he signed it. *Daniels v. United States*, 809 F.3d 588, 589 (11th Cir. 2015).

## II.

We review the district court's interpretation and application of the PLRA's exhaustion requirement de novo. *Johnson v. Meadows*, 418 F.3d 1152, 1155 (11th Cir.2005). We review the court's factual findings related to the exhaustion of administrative remedies for clear error. *Varner v. Shepard*, 11 F.4th 1252, 1257 (11th Cir. 2021).

We review a district court's summary judgment ruling de novo, considering the evidence in the light most favorable to the nonmovant and drawing all reasonable factual inferences in his favor. *Ireland v. Prummell*, 53 F.4th 1274, 1286–87 (11th Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

We consider the district court's rulings on DiPietro's claims against each defendant in turn. We affirm the district court's dismissal of his claim against Foreman based on his failure to exhaust his administrative remedies for that claim. And we affirm the court's summary judgment in favor of the remaining healthcare providers because the claim against Barron was barred by the statute of limitations,[2] and DiPietro failed to present evidence that

---

[2] The district court also concluded that DiPietro failed to exhaust available administrative remedies with respect to his claim against Barron. DiPietro

would support a jury verdict in his favor on his claims that Silver and Thompson were deliberately indifferent to a serious medical need.

## A.

Under the PLRA, a prisoner is required to properly exhaust all available administrative remedies before filing a federal lawsuit regarding prison conditions. 42 U.S.C. § 1997e(a); *see Jones v. Bock*, 549 U.S. 199, 202 (2007). The Georgia Department of Corrections provides a two-step grievance procedure: first, the prisoner must submit a written grievance within ten days of any grievable occurrence. Second, if the prisoner receives a negative response or if the responsible prison staff member does not respond within the time provided (40 days, with a 10-day extension available upon written notice), the prisoner must file an appeal to the "central office" within 7 days. "To exhaust administrative remedies in accordance with the PLRA, prisoners must properly take each step within the administrative process. If their initial

---

filed at least one grievance seeking compensation for Barron's alleged lack of care, and Barron concedes that the district court erred in determining that that grievance was untimely. But the parties dispute whether DiPietro filed an appeal from the denial of that grievance, a question of fact that the district court did not directly address. We decline to resolve this factual issue ourselves because we conclude that DiPietro's claim against Barron was barred by the statute of limitations. *See, e.g., Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("We may affirm on any ground supported by the record.") (quotation omitted)).

grievance is denied, prisoners must then file a timely appeal." *Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008) (quotation omitted).

When considering a motion to dismiss for failure to exhaust administrative remedies under the PLRA, the district court must first evaluate whether the prisoner has exhausted his administrative remedies under his own version of the facts. *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). If the facts as stated by the prisoner show a failure to exhaust, then the district court must dismiss the complaint. *Id.* "If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." *Id.*

DiPietro's claims against Jerrye Foreman arise from treatment she provided at GDCP. At the time of his conviction, DiPietro reportedly had been taking Lexapro for depression and Xanax for anxiety (both prescribed by a psychiatrist) for several years. Providers at the county jail where DiPietro was incarcerated immediately after his conviction did not prescribe those medications for him, however, and by the time he reached GDCP on May 5, 2016, he had not taken any psychiatric medication for two months.

DiPietro requested mental health services, including antidepressant medications, during his mental health intake examination at GDCP. A psychologist referred him to Foreman, whose license as an advanced practice nurse authorizes her to prescribe

psychiatric medications, and she evaluated DiPietro on May 24, 2016. Foreman determined that there was no indication for medication, though she noted that DiPietro was very depressed and needed counseling. According to DiPietro, he reluctantly agreed to continue without medication upon Foreman's assurance that she would see him again if he changed his mind. But when he did change his mind, Foreman ignored his sick call requests and did not prescribe medication for him.

The parties dispute whether DiPietro exhausted his administrative remedies for his claim against Foreman. DiPietro testified that he submitted a grievance against her at GDCP, but he was not given a receipt and his grievance was ignored. The grievance coordinator at GDCP testified that every inmate receives a receipt for each grievance he submits, and that each grievance submitted is logged into a central database at or near the time the inmate submits it and then investigated by prison staff and responded to in writing by the warden or his designated representative. The grievance coordinator further testified that the central database showed that DiPietro did not file any grievances at GDCP, and that she was not aware of, and had no record of, any grievance submitted by DiPietro that was not entered into the database and processed according to the usual procedure.

The district court found that DiPietro's testimony was not credible and accepted the defendants' evidence that he did not file a grievance about Foreman at GDCP. This finding was not clear error. As the magistrate judge pointed out, DiPietro's testimony

on several different topics was inconsistent, undermining his credibility.  With respect to the grievance process at GDCP, DiPietro's testimony that prison staff failed to follow the standard operating procedure at every stage—by failing to orally explain the process to him at intake, failing to provide a grievance handbook, failing to give him a receipt for either of the grievances he says he submitted at GDCP, and failing to log in, process, or respond to either of those grievances—seems unlikely.  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

In any event, although DiPietro claimed that he submitted a grievance about Foreman's care at GDCP, he never claimed to have exhausted the grievance process by filing an appeal when the warden failed to respond, and he does not argue in this Court that the grievance appeal process was unavailable to him.  The district court did not err in dismissing DiPietro's claim against Foreman on the ground that he did not exhaust his administrative remedies before filing the claim. *See Bryant*, 530 F.3d at 1378.

## B.

Like Foreman, James Barron provided care to DiPietro at GDCP.  Barron, who is a dentist, saw DiPietro for a toothache on May 16 and June 8, 2016.  He examined DiPietro, took dental x-rays, and prescribed ibuprofen and an antibiotic.  According to DiPietro, Barron said that he would clean DiPietro's teeth and make a mouth guard for him, but he never followed through and

did not see him again.  He alleged that if Barron had provided additional treatment, he could have avoided months of pain and the eventual removal of the affected tooth.

The district court determined that DiPietro's claim against Barron was barred by the statute of limitations, which in Georgia is two years.  *See Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008).  The statute of limitations begins to run when the plaintiff knows or should know that he has suffered the injury that is the basis of the complaint and knows or should know who inflicted it.  *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003).  At that point, the "cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace v. Kato*, 549 U.S. 384, 391 (2007).

On appeal, DiPietro argues that Barron's alleged deliberate indifference was a "continuing violation," so that the statute of limitations did not begin to run until his tooth was pulled on August 31, 2016.  "The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006).  Here, DiPietro argues that Barron's refusal to provide treatment after June 8, 2016, constituted a continuing or recurring violation of his Eighth Amendment rights.  But even if we assume for purposes of this analysis that the failure to provide additional treatment at GDCP constituted deliberate indifference, Barron could not have deliberately withheld treatment for DiPietro after he was

transferred to Augusta on July 16, 2016.  After that date, Barron could not have provided dental treatment to DiPietro in any event.

Moreover, "we have limited the application of the continuing violation doctrine to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred." *Id.* at 1335.  DiPietro testified that the medication prescribed by Barron stopped working within a few weeks, that he experienced severe pain and swollen gums beginning in June 2016, and that he repeatedly complained to Barron that he needed additional treatment between his last visit on June 8, 2016, and his transfer to Augusta on July 16.  On these facts, the district court did not err in determining that the two-year statute of limitations began to run no later than July 16, 2016.  DiPietro's claim against Barron, which was filed on August 19, 2018, was untimely.

## C.

We turn next to DiPietro's claim against Donna Silver, the psychiatrist who treated him after his transfer to Rutledge Prison on August 16, 2016.  DiPietro contends that Silver's failure to evaluate him and prescribe medication to treat his depression and anxiety before September 13, 2016, constituted deliberate indifference to his risk for suicide.[3]  A "delay of treatment for obviously serious

---

[3] In the district court, DiPietro also alleged that Silver and Thompson failed to appropriately treat his anxiety after his suicide attempt.  But he does not press those arguments on appeal.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739

21-13621                Opinion of the Court                11

conditions" may constitute deliberate indifference "where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified." *Taylor v. Adams*, 221 F.3d 1254, 1259–60 (11th Cir. 2000) (quotation omitted). The deliberate-indifference standard requires that the plaintiff prove that the defendant "had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008). To establish deliberate indifference to the risk of suicide, the plaintiff must show the defendant deliberately disregarded "a strong likelihood rather than a mere possibility" that the prisoner would harm himself. *Id.* (quotation omitted).

DiPietro cannot meet that standard here because the information available to Silver before September 13, 2016, did not indicate a "strong likelihood" that DiPietro would harm himself unless he received immediate psychiatric treatment. At the time of his transfer to Rutledge, DiPietro's chart showed that he had consistently complained of depression and anxiety, and on May 11, 2016, he reported to a psychologist at GDCP that he had occasional thoughts of suicide lasting a few minutes but without a plan. That same day, however, and in other evaluations in May and June 2016, DiPietro reportedly denied any suicidal ideation or any history of

---

F.3d 678, 681 (11th Cir. 2014) (arguments not effectively raised on appeal are deemed abandoned).

attempting to harm himself.  And of course, DiPietro's chart contained Foreman's May 24, 2016, report expressing her opinion that treatment with psychiatric medication was not indicated at that time.

DiPietro's chart also showed that he had been evaluated by a psychologist less than a week before his transfer to Rutledge.  The psychologist described DiPietro as "markedly tearful" and noted his report of feeling helpless, hopeless, and sad, but also stated that DiPietro denied any suicidal ideation.  The psychologist recommended that DiPietro be evaluated by a psychiatrist within 60 to 90 days to determine whether he would benefit from psychiatric medication.

A week after his arrival at Rutledge, on August 23, 2016, DiPietro met with a mental health counselor.  DiPietro testified that he was a "basket case" during the interview.  He testified that he could not stop crying, that he told the counselor he had been "denied" psychiatric medications since March, that he was having a "mental health emergency," and that he was having suicidal thoughts.  He also testified that he was careful to reassure the nurse that he had no current plan to commit suicide, because he did not want to be put in a suicide-watch cell.  According to DiPietro, the counselor told him that he would be seen "in a day or so since it was urgent."

But regardless of what the counselor told DiPietro, there is no evidence that any urgent need for treatment was conveyed to Silver.  To the contrary, the counselor's contemporaneous note

indicated that DiPietro's chief concern was the heat in his dormitory. The counselor's only comment about his mental state was that his "[d]isposition of attitude" was "positive." Silver testified that she did not recall receiving any information indicating that DiPietro needed to be seen urgently until after his suicide attempt on September 13, 2016. In the meantime, DiPietro was placed on Silver's case list for routine assessment, which typically would be done "as soon as practical," unless "an emergent or urgent change in circumstances" occurred.

DiPietro alleged that he waited about a week after his August 23 intake interview with the mental health counselor and then "started writing sick calls" requesting to be seen by the psychiatrist. Two weeks later, he tried to hang himself in his cell. After his attempt failed, he informed the mental health counselor that he had tried to commit suicide. The counselor called the mental health director (Thompson), who referred DiPietro to Silver on an emergency basis, and Silver evaluated DiPietro the same day.

This evidence would not support a jury verdict of deliberate indifference by Silver. Although it may have been apparent that DiPietro needed mental health services and might benefit from psychiatric medications, the evidence does not indicate that Silver was subjectively aware of an urgent need for treatment or that a delay in treatment would detrimentally exacerbate DiPietro's mental condition. The district court did not err in granting summary judgment in Silver's favor.

## D.

Last, we consider DiPietro's deliberate-indifference claim against psychologist John Thompson. DiPietro acknowledges Thompson's testimony that he was designated for evaluation by the psychiatrist (Silver), not Thompson, and that he was never part of Thompson's caseload. DiPietro argues that as the Mental Health Clinical Director at Rutledge, Thompson should nonetheless have been aware of his mental health history and his need for psychiatric services. But DiPietro has presented no evidence that Thompson actually was aware of his need for treatment before his suicide attempt.[4] This lack of evidence of subjective awareness is fatal to DiPietro's Eighth Amendment claim; to be held liable for deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also id.* at 838 ("an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment").

---

[4] DiPietro points to the allegation in his amended complaint that Thompson told him after his September 13 suicide attempt that he was "aware of [DiPietro's] chart." But to survive a properly supported motion for summary judgment, a plaintiff cannot rely on the allegations in his pleading; he "must present affirmative evidence" from which a jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).

The district court did not err in granting Thompson's motion for summary judgment on DiPietro's deliberate-indifference claim.

## IV.

For the foregoing reasons, we affirm the district court's judgment in favor of the defendants.

**AFFIRMED.**